Magistrate Judge Theresa L. Fricke

FILED ___ LODGED
___ RECEIVED
DEC 04 2018
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY                                    DEPUTY

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ALLEX HUBLY and<br>DAVID JOZEPH HUBLY,<br><br>Defendants. | CASE NO. MJ18-5292<br><br>**COMPLAINT for VIOLATION**<br><br>Title 21, United States Code,<br>Sections 841(a)(1) and (b)(1)(B), and Title 18, United States Code, Section 2 |

BEFORE, the Honorable Theresa L. Fricke, United States Magistrate Judge, United States Courthouse, Tacoma, Washington.

The undersigned complainant being duly sworn states:

## COUNT 1
### (Distribution of a Controlled Substance)

Beginning in or about December, 2017, and continuing until in or about October 2018, in Pierce County, within the Western District of Washington, ALLEX HUBLY and DAVID JOZEPH HUBLY did knowingly and intentionally distribute, and aid and abet the distribution of, a substance controlled under Title 21, United States Code, Section 812, Schedule I, to wit: heroin.

It is further alleged this offense involved 100 grams or more of a mixture or substance containing heroin.

All in violation of Title 21, United States Code, Section 841(a)(1) and (b)(1)(B), and Title 18, United States Code, Section 2.

And the complainant states that this Complaint is based on the following information:

I, Steven J Meyer, being first duly sworn on oath, depose and say:

## I. INTRODUCTION AND AFFIANT BACKGROUND

1. I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

2. I am a Special Agent with the Drug Enforcement Administration (DEA), and have been since March 2017. I am currently assigned to the Seattle Field Division, Tacoma Resident Office. Prior to my employment with the DEA, I worked as a Uniformed Officer with the Secret Service in Washington D.C., from June 2006 to April 2009. I received formal training at the DEA Basic Agent Training in Quantico, Virginia. The four-month Basic Academy included comprehensive, formalized instruction in, among other things: basic narcotic investigations, drug identification and detection, familiarization with United States narcotics laws, financial investigations and money laundering, identification and seizure of drug-related assets, organized crime investigations, physical and electronic surveillance, and undercover operations.

3. During the course of my law enforcement career, I have been involved in investigations of numerous criminal offenses, including the offenses involved in this current investigation. I have participated in criminal investigations of illicit drug trafficking organizations, ranging from street-level dealers to major dealers, to include Mexico-based drug trafficking organizations. These investigations have also included

the unlawful importation, possession with intent to distribute, and distribution of controlled substances; the related laundering of monetary instruments; the conducting of monetary transactions involving the proceeds of specified unlawful activities; and conspiracies associated with criminal narcotics offenses. These investigations have included use of the following investigative techniques: confidential informants; undercover agents; analysis of pen register, trap and trace, and toll records; physical and electronic surveillance; wiretaps; and the execution of search warrants. I have had the opportunity to monitor, listen to, review transcripts and line sheets (prepared by linguists) documenting the content of intercepted conversations involving the trafficking of cocaine, heroin, methamphetamine, and other narcotics, by persons who used some form of code to thwart law enforcement. I have also interviewed defendants at the time of their arrests and have debriefed, spoken with, or interviewed numerous drug dealers or confidential sources (informants) at proffer interviews who were experienced in speaking in coded conversations over the telephone. I have gained knowledge regarding the various methods, techniques, codes, and/or jargon used by drug traffickers in the course of their criminal activities, including their use of cellular telephones and other electronic devices to facilitate communications while avoiding law enforcement scrutiny.

## II. PURPOSE OF AFFIDAVIT

4. This Affidavit is submitted in support of a Complaint charging ALLEX HUBLY and DAVID JOZEPH HUBLY with the offense of Distribution of a Controlled Substance, in violation of Title 21, United States Code, Sections 841(a) and (b)(1)(B), and Title 18, United States Code, Section 2.

5. The facts set forth in this Affidavit arise from my personal and direct participation in this investigation, my experience and training, my conversations with witnesses and other law enforcement personnel participating in this investigation, and my review of documents and reports. This Affidavit does not include each and every fact known to me concerning this investigation. Instead, I have set forth only the facts I believe are necessary to establish probable cause for the offenses charged in this

Complaint, and I have set forth only those facts I believe are necessary to make such a determination.

### III. SUMMARY OF INVESTIGATION

6. Agents are investigating a drug trafficking organization (DTO) in Western Washington they believe Juan and Florencio CASTRO Valenzuela and their associates, including ALLEX HUBLY, DAVID JOZEPH HUBLY, and others known and unknown, are operating. This organization is referred to as the CASTRO DTO and is predominantly involved in the trafficking of high-purity heroin, counterfeit oxycodone pills, and methamphetamine. This investigation started as a local drug investigation by the Bremerton Police Department in August 2017, and has been expanding in scope ever since that time.

7. During this extensive investigation, agents have conducted multiple controlled and undercover purchases of heroin (totaling around 500 grams) using a confidential source and an undercover agent; conducted hundreds of hours of physical and electronic surveillance; installed tracking devices on several target vehicles and tracking devices/pen registers on several target telephones; used mounted surveillance cameras to watch the activities at several significant DTO locations; executed several search warrants on Facebook accounts used by the CASTROs to aid in their distribution of heroin in Western Washington; and obtained court authorization to intercept communications over a CASTRO DTO courier's phone (TT19). As part of the instant investigation, investigators received information about the CASTRO DTO from a confidential source as described below.

8. Confidential Source One (CS1) agreed to cooperate with law enforcement in 2017, in exchange for judicial considerations. CS1 was arrested by members of the Bremerton Police Department Special Operations Group (SOG) for his/her involvement in drug trafficking. CS1 cooperated with SOG and provided them with information about a group of Mexican drug traffickers who were distributing large amounts of heroin in the Puget Sound region. CS1 advised SOG that he/she had been selling various controlled

substances for several years and had been in contact with several of the people within this group of Mexican drug traffickers (the CASTRO DTO). CS1 spoke to SOG about a now-prominent member of the DTO whom the CS knew as "Juan" or "Jose." The CS believed the individual he/she knew as "Juan/Jose" was the local leader of the DTO at the time when "Juan/Jose" and the CS had originally met several years ago, and believed "Juan/Jose" was more recently promoted to a larger role in the DTO.

9. CS1 told members of SOG that "Juan/Jose" used Facebook to communicate with the CS and many other heroin distributors. Bremerton Police Detective (Det.) Jordan Ejde located a Facebook account under the name of "Juan Andres Castro Valenzuela" with which CS1 and other local suspected drug dealers were associated. Det. Ejde questioned CS1 about the account and CS1 confirmed "Juan Andres Castro Valenzuela" was the male whom he/she referred to as "Juan" or "Jose." CS1 also showed Det. Ejde messages confirming that Juan CASTRO was in contact with CS1, using the account in his (Juan CASTRO's) name. According to CS1 and the Facebook data he/she provided, he/she has been talking to Juan CASTRO via Facebook Messenger for purposes of making drug transactions since the summer of 2016.

10. Det. Ejde and DEA Special Agent Anthony DelVecchio confirmed Juan CASTRO's identity via records contained in the Washington Department of Licensing (WADOL) database. Specifically, Juan CASTRO's WADOL photograph matches that of the individual on the "Juan Andres Castro Valenzuela" Facebook account. Furthermore, according to a law enforcement database, Juan CASTRO was involved as a suspected "cell head" for heroin distribution in the Everett area during a DEA investigation that took place in 2012. Special Agent DelVecchio researched this prior DEA case and found Juan CASTRO was, in fact, the primary target of investigation in that case. Agents seized multiple kilograms of heroin in that investigation, but did not arrest CASTRO.

11. A review of CS1's Facebook account showed Juan CASTRO also contacted CS1 from additional Facebook accounts under the names of "Rebeca Spencer," "Annel Baker," and "Katherine Thomas." A review of CS1's phone showed Juan

CASTRO additionally used Mexican phone numbers 52-668-199-4039 (TT1), 52-668-248-4230, 52-668-225-5890, and 52-668-199-5533 (TT2) to communicate with CS1 via text message and voice calls. The "Katherine Thomas" Facebook account and TT1 were Juan CASTRO's most current methods of drug related communications with CS1 at the time he/she provided the initial information to SOG.

12. Utilizing CS1, SOG conducted six controlled purchases of suspected heroin from Juan CASTRO through a courier, Jesus Rene Sarmiento Valenzuela (aka "Miguel"), totaling approximately 90.4 grams. Prior to and after each controlled purchase of heroin, detectives searched CS1 and his/her vehicle, and provided CS1 with pre-recorded SOG funds to make each purchase. During the course of each controlled purchase, detectives maintained surveillance on CS1. After each purchase, detectives tested the suspected heroin using a NIK test kit with presumptive positive results for the presence of heroin, and then processed the heroin according to SOG's policies and procedures. For the second through sixth controlled purchases, detectives recorded the buys with a covert surveillance camera.

13. SOG and DEA began their joint investigation into the CASTRO DTO in the fall of 2017 and used CS1 to make another (seventh) controlled purchase of heroin from the CASTRO DTO. CS1 continued to provide agents with updated information on the DTO's communications methods/platforms and, as detailed later in this Affidavit, CS1 was able to introduce an undercover DEA agent (UC) to the CASTRO DTO towards the end of 2017.

14. Unfortunately, CS1 was battling heroin addiction for most of the time he/she was working with agents. After the seventh controlled purchase with CS1 (the first in which the DEA was involved), which took place toward the end of October 2017, agents provided CS1 with cash reimbursement for his/her expenses after the purchase was completed. After this, CS1 and agents parted ways; agents assumed CS1 would travel back to his/her residence. Unfortunately, agents conducting surveillance of the CASTRO DTO couriers after the controlled purchase noticed CS1 returned to meet with

one of the couriers and seemed to conduct another, unsanctioned, drug transaction. Agents later questioned CS1 about this encounter and he/she was immediately truthful. CS1 told agents he/she had gone back to obtain a user amount of heroin. CS1 said being in the presence of heroin during the controlled purchase was enough of a temptation to ignite CS1's urge to use the drug personally. CS1 also told agents how he/she had previously taken (and later used) small portions of the heroin from some of the controlled purchases SOG had done prior to DEA's involvement. Obviously, such behavior is against law enforcement policies regarding confidential sources and their use in an investigation.

15. Agents spoke with CS1 about the dangers he/she faced by committing such crimes while working for law enforcement. After this discussion, CS1 told agents he/she wanted to continue to work for law enforcement (if allowed); he/she said it was very important to CS1 that he/she help take the CASTRO DTO's drugs off the streets. CS1 described his/her addiction to heroin as one of the strongest mental struggles a person would ever have to deal with. From my training and experience, I know CS1's statements regarding the struggle against heroin addiction to be true. CS1 told agents he/she would be willing to enter into a drug rehabilitation program or do whatever it took to get past this addiction and help law enforcement take down the CASTRO DTO while doing so. Together, agents and CS1 developed a method of helping CS1 to combat his/her addiction while helping the investigation.

16. Agents provided CS1 with access to drug treatment programs and got CS1 enrolled in a rehabilitation center; they even arranged for atypical expense reimbursements for CS1. Rather than cash reimbursement for expenses incurred during government operations, agents provided CS1 with food cards or gasoline—things that were not readily convertible into cash. Agents did so at the request of CS1, so he/she would not be tempted to purchase drugs with any excess money. These methods worked for a time.

17. CS1 successfully completed several months of his/her rehabilitation program before staff asked CS1 to leave due to his/her attitude problems and problems with other rehabilitation patients. CS1 continued to help agents by providing information about the DTO and helping to build the UC's reputation. However, CS1 relapsed into heroin use in the spring of 2018. This time, CS1 quite rapidly spiraled downward into an almost paranoid and delusional state. Agents determined they could no longer use CS1 for any investigative purposes, but tried once again to get CS1 some help with his/her drug problem. Unfortunately, CS1 was not as amenable on this occasion and shunned agents' attempts at providing assistance. In May 2018, local police arrested CS1 and charged him/her with residential burglary (felony) and driving with a suspended or revoked license (misdemeanor). SOG deactivated CS1 in May 2018 due to CS1's substance abuse issues. However, agents found CS1's information to be reliable during the time agents utilized him/her to gather information.

18. CS1's criminal history includes a felony conviction for Manufacture/Deliver a Schedule I/II Narcotic in 2013, gross misdemeanor convictions for Fourth Degree Assault in 2015 and Third Degree Malicious Mischief in 2011, as well as misdemeanor convictions for Third Degree Driving With a Suspended or Revoked License in 2018 and 2008, Indecent Exposure in 2013, and Third Degree Malicious Mischief in 2006.

19. As noted above, CS1 was able to introduce an undercover agent (the "UC") to the CASTRO DTO via a conversation over Facebook Messenger (with the Katherine Thomas Facebook account). The UC was able to conduct three purchases of heroin from the CASTRO DTO, through Sarmiento, before the end of 2017. During the first purchase, the UC used a combination of communications over Facebook Messenger (with the Katherine Thomas account), TT1, and TT3 to complete the transaction. During the UC's second purchase, he/she communicated with the DTO through the Katherine Thomas Facebook account and TT1. The UC conducted a third transaction with the DTO

in December 2017. Again, the UC communicated with the CASTRO DTO over the Katherine Thomas Facebook account and TT1.

20. On December 24, 2017, Juan CASTRO contacted the UC through Facebook Messenger, using the Katherine Thomas account. Juan CASTRO explained to the UC that his cousin, "Luis" would be the point of contact for any immediate deals the UC required. CASTRO told the UC he/she could contact "Luis" via TT4, but not over Facebook Messenger. The UC then made contact with "Luis" over TT4 in mid-January 2018, but the two were not able schedule a drug transaction. The UC contacted Juan CASTRO on the Katherine Thomas Facebook account and confirmed "Luis" was, in fact, the new courier; Juan CASTRO told the UC to just contact him (CASTRO) directly and he would handle the specifics with "Luis." Agents later identified "Luis" as Arturo Frias Ceballos.

21. Shortly thereafter, agents received hundreds of pages of Facebook account information from the Katherine Thomas account, pursuant to a federal search warrant. This information received from Facebook clearly showed use of the Katherine Thomas account for drug trafficking purposes, just as agents had suspected. Agents later received court authorization to search additional accounts associated with the CASTRO DTO and found very similar data of evidentiary value. The following review of the Katherine Thomas Facebook account will serve as an example of the types of data/information and content agents received from the search warrants later executed on additional CASTRO DTO accounts.

22. Facebook records showed account number "100021806071829," which is associated with the vanity name of "Katherine.thomas.104418," was registered on August 24, 2017, at 19:19:37 UTC. As of January 2018, Facebook records showed the account was still active. The verified cell phone number associated with this account was "+526681994039" (TT1), which was verified through Facebook on the day the account was established. Facebook records showed a listing of internet protocol (IP) addresses

captured during different activities on Facebook (such as logging in or sending an attachment).

23. These records also showed three linked accounts used by the same digital device/computer: Katherine Thomas (100021806071829), Florencio CASTRO Valenzuela (100006465750228), and Annel Baker (100017854953772). Agents had separately established this same connection between these accounts based on CS1's information and their own records searches. Agents know the CASTRO DTO used the Annel Baker account previously in the same manner as they used the Katherine Thomas account, based on CS1's information.

24. Facebook records showed the listed date of birth on the Katherine Thomas account as a date in February 1990. Juan CASTRO's criminal record lists his date of birth as that same February date, but in 1986. Agents suspect the common birthdate between the Katherine Thomas Facebook account and Juan CASTRO is no coincidence, and that CASTRO most likely used it because it is a date he can easily remember.

25. These Facebook records also list all of Juan CASTRO's Facebook friends associated with this particular account and their Facebook account numbers. Agents have identified all of these Facebook friends based on their names and Facebook photographs, and a comparison with WADOL records. Agents have conducted surveillance on many of the individuals listed below, along with law enforcement research on these individuals, and suspect, based on agents' physical surveillance observations, they are heroin distributors for the CASTRO DTO in Washington. The Facebook Messenger portion of the records received from Facebook also corroborated agents' suspicions regarding these individuals. As expected, the UC's Facebook account was also listed in this section of the report.

26. The last portion of the Facebook records was a chronological listing of messaging strings, separated by individual Facebook accounts. These messaging strings were similar to text message conversations commonly found on mobile phones, though these messaging conversations were between the Katherine Thomas account and the

Facebook friends listed above (the suspected heroin distributors for the DTO). Agents conducted a review of the messaging section of the Katherine Thomas account records and noted some key items of information that were relevant to the investigation. Agents repeated this process with seven additional Facebook accounts used by the CASTROs throughout 2017 and 2018.

27. On December 14, 2017, ALLEX HUBLY (using a Facebook account in her name) asked Juan CASTRO about the "blue pills" and if she could have more of those pills from CASTRO. CASTRO said he was sold out but would have more on "Saturday." ALLEX HUBLY asked if the pills were "for sure real," and CASTRO replied, "llok [sic], this pills are manufactured in clandestine laboratories, these are not pharmaceutical." Agents believe ALLEX HUBLY and CASTRO were likely discussing counterfeit oxycodone pills, based on ALLEX HUBLY's specificity with regard to the color of the pills.

28. During the court-authorized interception of DTO courier Juan Jose Higuera Gonzalez's phone (TT19), it appeared that ALLEX HUBLY was continuing to place her drug orders through Facebook, as the intercepted communications between her and Higuera related to the timing of Higuera's arrival for drug deliveries. For example, on July 1, 2018, ALLEX HUBLY asked Higuera, "how far away are you?" Electronic surveillance showed Higuera (in one of the identified DTO courier vehicles, TV3) then arrived at the HUBLY residence for a two-minute visit. I believe, based on my training and experience, that this short-stay visit was consistent with a drug transaction.

29. Facebook records showed ALLEX HUBLY's account was the main account used by the HUBLYs, but those records also showed ALLEX HUBLY made references to DAVID JOZEPH HUBLY's involvement (referring to him as "DJ"). Agents on physical surveillance saw ALLEX and DAVID HUBLY, together, during multiple interactions with CASTRO DTO couriers; and they saw DAVID HUBLY meet with Higuera for a suspected drug transaction at the HUBLY residence on at least two occasions. Estimates based off the Facebook materials alone showed the CASTROs

provided the HUBLYs with over 1,500 grams of heroin from November 2017 to August 2018.

30. Facebook records across multiple accounts used by CASTRO showed the HUBLYs conducted no less than 45 transactions with CASTRO's couriers during this investigation. For example, on August 11, 2018, CASTRO contacted the HUBLYs through his "Rudy Jackson" Facebook account. CASTRO asked, "…how many pieces you want?" The HUBLYs replied, "for myself of the stuff I get I want 3.1k worth this guy wants 5 but wants to try it first." From this, agents believe one of the HUBLYs was asking for $3,100 worth of heroin and then 125 grams of additional heroin for one of the HUBLYS' fellow heroin distributors. The two discussed further logistics of the deal and CASTRO eventually asked, "you want that my cousin will bring 5 pieces extra? Right?" The unspecified HUBLY decided to conduct a total purchase for 125 grams instead of conducting two independent transactions with CASTRO's courier. CASTRO said the price for 5 pieces (125 grams) would typically be "$5375," but he would give a slight discount (to "$5.2k").

31. The two agreed to conduct the transaction initially at ALLEX and DAVID HUBLY's residence in Puyallup. Tracking data for TV3 confirmed Higuera traveled to the area of ALLEX and DAVID HUBLY's residence on that date, at 6:20 p.m. Facebook records showed CASTRO tried to contact the HUBLY account around that same time, but did not receive a response. CASTRO messaged the HUBLY account, "If you are not ready yet him will go to spanaway." One of the HUBLYs asked CASTRO to check with his courier and "ask him if he wants to meet at mall." CASTRO asked, "south hill mall?" The HUBLY account user confirmed. Tracking data for TV3 showed the vehicle traveled to the South Hill Mall in Puyallup after leaving the area of the HUBLY residence. The vehicle remained in the parking lot for a few minutes and then left. Agents believe HUBLY's transaction was completed within these few minutes.

32. On August 13, 2018, Facebook records showed what looked like the continuation of a conversation the HUBLYS and CASTRO may have originally started

over the telephone. One of the HUBLYs messaged, "hey my phone died…" CASTRO replied to the HUBLY Facebook account and said, "he is on way to red house… you're there??" The unspecified HUBLY replied, "Yes. Did I say 2600 or 2800?" CASTRO replied, "$2600." The unspecified HUBLY then asked, "How much was he supposed to give me?" and CASTRO replied, "60gr." Tracking data for TV3 (driven by Higuera at the time) showed the vehicle arrived at the HUBLY residence at 7:38 p.m. on that day and stayed there for less than five minutes—consistent with yet another drug transaction. From this conversation and electronic surveillance data, agents believe HIGUERA delivered 60 grams of high-purity heroin to the HUBLYS, at their residence in Puyallup. The house the HUBLYS were living in at the time was painted red, hence CASTRO's reference to the "red house." I believe these Facebook records show the HUBLYS paid $2,600 for this heroin. ALLEX and DAVID HUBLY were both present during prior physical surveillance of suspected drug transactions with CASTRO DTO couriers at that same residence. Agents have seen both ALLEX and DAVID HUBLY interacting with these couriers. I believe the ALLEX HUBLY Facebook account is a shared account between these spouses and they are both responsible for the distribution of at least 1,000 grams of high-purity heroin in Western Washington.

33. In October 2018, agents, through physical and electronic surveillance, observed the DTO courier vehicle (TV3) travel to a location near Yakima Ave. in Tacoma. At that time, agents were unable to confirm where exactly it stopped. On October 29, 2018, Special Agent Jeremy Tan observed, via electronic surveillance, TV3 drive to a residence located at 713 S Yakima Ave., Tacoma, Washington. TV3 stopped at the residence at 5:52 p.m. and remained there for about seven minutes before departing. This is just one instance where agents have observed (through electronic tracking) CASTRO DTO couriers travel to and from 713 S Yakima Ave., Tacoma, Washington. In September and October of 2018, agents observed, utilizing real-time tracking data, couriers for the CASTRO DTO stop at 713 S Yakima Ave., Tacoma, Washington, over 25 times and conduct short stay visits. As stated above, I recognize

1 | this short stay traffic to be a type of behavior consistent with behaviors displayed by drug
2 | traffickers.

3 | 34.    On October 30, 2018, TFO Anthony Nisco went to the 713 S Yakima Ave.,
4 | Tacoma, Washington residence to determine who lived there. While there, TFO Nisco
5 | observed the name "HUBLY" written on a piece of paper affixed to the mailbox of
6 | Apartment 9. Additionally, TFO Nisco observed a black 2009 Kia Spectra bearing
7 | Washington license BDF8264 registered to DAVID JOZEPH HUBLY parked in the
8 | parking lot behind the apartment complex near the entrance to Apartment 9. Based on
9 | my training and experience, real-time tracking data over TV3, agents' observations and
10 | the conversations obtained from the Facebook search warrant materials, I believe ALLEX
11 | and DAVID HUBLY are residing at 713 S Yakima Ave., Apartment 9, Tacoma,
12 | Washington, and are receiving drugs from the CASTRO DTO, delivered by the couriers
13 | in TV3. I further believe that given the number of visits to the HUBLY residence by the
14 | DTO couriers, the HUBLYs are obtaining heroin for redistribution to others.

15 | 35.    ALLEX HUBLY has a lengthy criminal history, consisting most notably of
16 | convictions in 2014 for two counts of possession of a controlled substance
17 | (methamphetamine & suboxone), two counts of forgery, and two counts of controlled
18 | substance—false information (attempted to obtain oxycodone) (12 months jail); and in
19 | 2013 for theft 3 (four days jail). She appears to have been arrested in 2016 on probation
20 | violations, and has a litany of other arrests for which the dispositions are unknown.
21 | DAVID JOZEPH HUBLY's criminal record consists of three arrests in 2008 for driving
22 | with a suspended/revoked license, drug paraphernalia/use, and telephone harassment.

23 | 36.    On November 29, 2018, a Grand Jury sitting in the Western District of
24 | Washington returned an Indictment against 31 members of the CASTRO DTO, including
25 | Higuera, on drug trafficking conspiracy and related charges.

COMPLAINT/Allex and David HUBLY - 14

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

## IV. CONCLUSION

37. Based on the above facts, I respectfully submit that there is probable cause to believe that the Defendants committed the offense set forth in this Complaint.

Steven J. Meyer, Complainant
Special Agent, Drug Enforcement Administration

Based on the Complaint and Affidavit sworn to before me, and subscribed in my presence, the Court hereby finds that there is probable cause to believe the Defendant committed the offenses set forth in the Complaint.

Dated this 4th day of December, 2018.

THERESA L. FRICKE
United States Magistrate Judge

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800